FILED
2020 Jul-30  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## (SOUTHERN DIVISION)

|  |  |
|---|---|
| JENNMAR OF KENTUCKY, INC. AND COMPLIANCE STAFFING AGENCY, LLC d/b/a JENNMAR SERVICES, <br><br> Plaintiffs, <br><br> v. <br><br> CURTIS R. WILSON, MICHAEL B. WILSON, AND JAMAS TECHNOLOGY, INC., <br><br> Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiffs Jennmar of Kentucky, Inc. and Compliance Staffing Agency, LLC d/b/a Jennmar Services (collectively, the "Plaintiffs") file this Complaint for injunctive relief and damages against Defendants Curtis R. Wilson ("Ray Wilson"), Michael B. Wilson ("Blaine Wilson" and with Ray Wilson, the "Wilsons"), and Jamas Technology, Inc. ("Jamas," and, with the Wilsons, the "Defendants") and in support thereof state as follows.

## INTRODUCTION

1.      Since 1972, Jennmar has been developing and manufacturing ground control technology and equipment for the mining, tunneling, and civil construction industries.  While maintaining its position as the global leader in the design and manufacturer of underground support systems, Jennmar and its affiliated companies have also grown to become industry leaders in chemical manufacturing, metal cutting, industrial fabrication, machining, and labor services, to name a few.

2.      One of the Jennmar companies that designs, manufactures and distributes underground support systems and associate equipment and services throughout the Midwestern and Southeastern United States is Plaintiff Jennmar of Kentucky, Inc., a wholly owned subsidiary of Jennmar.

3.      A second Jennmar affiliated company is Compliance Staffing Agency, LLC, which does business under the trade name of Jennmar Services.

4.      Plaintiff Jennmar Services is a full service staffing company that provides staffing services to companies in the coal and hard rock mining, oil, gas, industrial and manufacturing industries.

5.      Still a family-owned-and-operated business at its core, Jennmar's success and growth over the past fifty years is due in part to the loyalty and tireless efforts of its employees.

6.      Joining the Jennmar family of companies in April 2000 as a sales executive, Defendant Ray Wilson was long considered one of those loyal, trustworthy, and hard-working employees who contributed to the growth of Plaintiffs' businesses and, in turn, was handsomely compensated for those efforts.

7.      In October, 2009, Ray Wilson was promoted to Regional Technical Sales Manager for the Midwest and Southeast, becoming employed by Plaintiff Jennmar of Kentucky, Inc.

8.      In this position, which he held through his remaining tenure with Jennmar, Ray Wilson led the sales team with the broad charge of expanding each of Jennmar's businesses, including Jennmar Services, throughout the Midwestern and Southeastern United States.

9.      In this role, Ray Wilson was a member of Jennmar's senior sales team, participating in meetings occurring at the highest levels of the company with respect to sales, prospecting, growth strategies, and marketing, among other important responsibilities.

10. More importantly, Ray Wilson was Plaintiffs' "boots on the ground," and their lead business development executive in the Southeast and Midwest, cultivating and maintaining important customer relationships for Plaintiffs' businesses, including Jennmar Services' business of recruiting, training, certifying, and placing contract labor in underground coal mines throughout the Southeast and Midwest.

11. Plaintiffs paid Ray Wilson handsomely in this role, providing him with a generous salary, bonuses, fringe benefits and an expense account to help grow business opportunities and relationships for the Plaintiffs in these regions.

12. In the last five years alone, Ray Wilson earned in excess of one million dollars in salary, benefits, and bonuses, and was reimbursed for approximately an additional quarter of a million dollars in "business-related" expenses in the last three years, purportedly being used on golf outings, customer entertainment, and related travel to market and sell Plaintiffs' goods and services.

13. Despite the generosity Plaintiffs showed to Ray Wilson, he wanted more.

14. As such, Ray Wilson set about to use the financial resources, business relationships, and proprietary and confidential information entrusted to him by Plaintiffs to establish and operate one or more competing businesses with Plaintiffs and enlisting his son, Defendant William Blaine Wilson along the way.

15. It was recently discovered that Ray Wilson may have set up his competing business as early as 2004 and has been running it ever since, all the while concealing his nefarious activities from the Plaintiffs.

16. However, it was discovered only recently that Ray Wilson was directly competing with Plaintiffs, soliciting its customers, and diverting business opportunities away from Plaintiffs.

17.     Plaintiffs have only just begun their investigation, including a forensic computer and digital examination of his e-mail account and Jennmar-issued devices, into Ray Wilson's unlawful competition.

18.     To date, invoices, e-mails and other information directly connecting Ray Wilson to the management and control of Jamas Technology, Inc., which holds itself out as a direct competitor of Plaintiff Jennmar Services as a contract labor company "providing highly trained labor to the coal and metals/nonmetals industries," during his tenure with Plaintiffs, have been discovered in his employer-issued e-mail account.

19.     For example, copies of Jamas Technology invoices issued to Plaintiffs' customers and prospective customers in 2011, 2012, 2013 and 2018 for "contract labor" and identifying Ray Wilson as Jamas's point of contact have been discovered in Ray Wilson's e-mail account.

20.     Ray Wilson's betrayal of the trust of both his superiors and subordinates alike is matched only by his refusal to acknowledge and take responsibility for the significant financial and reputational damage he has brought to bear on Plaintiffs when confronted with these facts only weeks ago.

21.     Ray Wilson's fraud, deceit and treachery continued through to his separation from Plaintiffs as he only doubled down on denying any involvement with Jamas, describing the company as one owned and operated by his son, Defendant Blaine Wilson, a co-conspirator of his father's in their intentional and concerted acts to divert corporate opportunities away from the Plaintiffs for their own pecuniary gain.

22.     On July 10, 2020, Ray Wilson resigned from his employment with the Plaintiffs.

## THE PARTIES

23.     Plaintiff Jennmar of Kentucky, Inc. is a corporation organized under the laws of the State of Kentucky and maintains its principal place of business at 271 Gawthrop Drive, Winchester, KY 40391.   Jennmar of Kentucky, Inc. is a wholly owned subsidiary of Frank Calandra, Inc., a Pennsylvania corporation that has a principal place of business at 258 Kappa Drive Pittsburgh, PA 15238.

24.     Plaintiff Compliance Staffing Agency d/b/a Jennmar Services is a Pennsylvania limited liability company, of which its sole member is a citizen of Pennsylvania, and maintains its principal place of business at 160 Technology Drive, Suite 202 Canonsburg, PA 15317.   Its sole member is a Pennsylvania limited liability company which has four members, all of whom are Pennsylvania individuals or corporate entities.   It is registered to do business in Alabama.

25.     Defendant Curtis "Ray" Wilson is an adult individual who, upon information and belief, is domiciled at 1070 William's Trace, Birmingham, AL 35242.

26.     Defendant Michael "Blaine" Wilson is an adult individual who, upon information and belief, is domiciled at 1070 William's Trace, Birmingham, AL 35242.

27.     Defendant Jamas Technology, Inc. is a corporation organized under the laws of the State of Alabama that has a principal place of business at 64 Highway 265, Suite 501, Alabaster, AL 35007.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because this action involves an amount in controversy in excess of the sum of $75,000 and is between citizens of different states.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants Ray Wilson and Blaine Wilson reside in this judicial district, Jamas has its principal place of business in this judicial district, and the events giving rise to Plaintiffs' claims occurred in this judicial district.

## BACKGROUND

## RAY WILSON IS HIRED BY PLAINTIFFS

30.     Plaintiff Jennmar hired Ray Wilson on April 1, 2000 as a sales manager.

31.     While initially, Ray Wilson's sales responsibilities focused on selling Plaintiff Jennmar's underground roof support systems and equipment, his responsibilities grew to include developing new opportunities for other lines of business within the Plaintiffs' family of companies, including its labor staffing company, Plaintiff Jennmar Services, which specializes in recruiting, training, certifying, and placing temporary workers in positions both underground and above the surface for coal companies.

32.     With respect to Jennmar Services, Plaintiffs invested heavily in Ray Wilson, not only through his compensation and other benefits, but also by providing him with considerable resources to execute on Plaintiffs' unique strategy in the underground contract staffing space to identify, recruit, train, place, and retain people.

33.     Over the course of his twenty years with Plaintiffs, Plaintiffs thought Ray Wilson was managing its key business relationships with several major coal and mineral company customers for the purpose of maintaining and expanding opportunities for Plaintiff Jennmar Services and other companies affiliated with Plaintiffs, providing him with extensive and unfettered access to confidential, proprietary, and trade secret information, including customer

data and business intelligence, pricing models, training curriculum and materials, and other strategic information.

34.     Ray Wilson was even promoted to the position of Regional Technical Sales Manager, Plaintiffs' lead business development executive in the Southeast and Midwest, and was tasked with cultivating and maintaining important customer relationships for Plaintiffs' business of recruiting, training, certifying, and then placing contract labor in underground coal mines throughout the Southeast and Midwest.

## RAY WILSON'S EMPLOYMENT AGREEMENTS WITH PLAINTIFFS

35.     Recognizing the proprietary nature of some of the information to which Ray Wilson would be exposed in his role, the significant financial investment Plaintiffs were making in him, and the need to protect their legitimate business interests, Ray entered into several employment agreements with Plaintiffs over the years which set forth various terms and conditions relevant to his employment.

36.     While each prior employment agreement between Ray Wilson and Plaintiffs are essentially the same, a true and correct copy of the most recent Employment Agreement, effective February 1, 2015 by and between Jennmar of Kentucky, Inc. and Curtis R. Wilson (the "Employment Agreement") is attached hereto as **Exhibit 1**.

37.     By executing the Employment Agreement (and its predecessor agreements), Ray Wilson expressly promised, under Section 2, to:

> [A]ct at all times to promote the Company's business and best interests.  [Ray Wilson] understands that he/she is receiving the compensation in Section 4 of this Agreement in consideration for devoting his/her entire business time and efforts to the affairs of, and for the benefit of, the Company during the term of the Agreement. During the term of his/her employment under the Agreement, [Wilson] shall not, directly or indirectly, whether for compensation or otherwise, render any services to another business, commercial or professional in nature, to any other person, corporation, firm or organization.

38.     Upon executing the Employment Agreement, Ray Wilson further represented and warranted that he had "no other interest which is inconsistent or in conflict with this Agreement, or would prevent, limit, or impair, in an way, the performance by him/her any of the covenants or his/her duties under this Agreement." Employment Agreement, Section 7.

39.     Due to Ray Wilson's access to Plaintiffs' confidential and proprietary information in his position of sales manager, Section 8.2 of the Employment Agreement identifies and prohibits disclosure of confidential information.

40.     Section 8.2 defines Confidential Information as including:

[A]ny and all information about or relating to the Company's methods, processes, computer programs, customers and customer lists, services, products or pricing techniques, inventions, purchasing, accounting, consulting, marketing, merchandising, and/or the sale of any services and/or products to customers, production data, exploration, research or development programs, trade secrets, know-how, software, databases, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, costs, vendors, clients, partners, investors, personnel, compensation, recruiting, training, promotions, government and regulatory activities and approvals concerning the past, current or future business activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of the same to the Company on a confidential basis, which has been disclosed to [Wilson] or known by [Wilson] as a consequence of or through (his/her) employment by the Company. This information, by its nature, would if disclosed or utilized outside of the business of the Company, its subsidiaries and affiliates cause substantial harm to the business and prospects, financial and otherwise, of these entities.

41.     Additionally, Section 8.2 prohibits disclosure of such confidential information:

Employee will have access to the Company's Confidential Information. Accordingly, Employee agrees that [he] will not, either during or after [his] employment with the Company, use any Confidential Information for the benefit of any person or entity other than the Company. Employee must keep confidential all Confidential Information and not disclose any Confidential Information to any person except:

(a) With the prior consent of the Company;

(b) To the Company's agents, employees or advisors in the proper performance of [his] responsibilities and duties; or

(c) If [he] is compelled by law.

Employee shall immediately deliver to the Company all Confidential Information capable of delivery . . . upon termination of [his] employment…. These obligations will continue to apply after the expiration or termination of Employee's employment; however, caused, and are in addition to [his] duties of confidentiality at law or in equity.

42.     Given the highly competitive nature of Plaintiffs' business, Wilson agreed to be bound by certain reasonable and necessary restrictive covenants.

43.     Section 9.1 of the Employment Agreement contains a non-competition provision, under which Ray Wilson agreed to not compete directly with Jennmar:

**9.1 Non-Compete.** Given the highly competitive nature of the Company's business, Employee agrees that [he] will not, without the prior written consent of the Company, during [your] employment, either directly in any capacity (including without limitation as principal, agent, partner, employee, shareholder, unit holder, joint venture, director, trustee, beneficiary, manager, consultant or adviser) be engaged, concerned or interested in any business or activity which is competitive with any business carried on by the Company, or its parent or affiliated companies which could or might reasonably be considered by others to impair [your] ability to act at all times in the best interest of the Company, or its parent or affiliated companies. It is Employee's responsibility to notify the Company in writing of any proposed activity by [him] which may contravene this clause.

44.     Importantly, Ray Wilson agreed to abide by his non-compete obligations for a period of one year following his date of separation from Plaintiffs.

45.     The Employment Agreement also contains a non-solicitation provision that survives the agreement's termination by two years and prohibits interacting with Plaintiffs' customers:

**9.3 Non-Solicitation of Customers.** The Company's customers are essential to the success of the Company.  Thus, in exchange and consideration for the Company's agreement to employ Employee and to provide Employee with immediate access to the Company's Confidential Information, Employee agrees that, during the Term of this Agreement, and for two (2) years following the Term of this Agreement, whether or not Employee's employment terminates before the end of the Term:

(a) Employee will not directly or indirectly solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the business of the Company or its parent or affiliated companies;

(b) Employee will not directly or indirectly divert, entice, or take away any customers, business, patronage or orders of the Company or its parent or affiliated companies, or attempt to so; and

(c) Employee will not directly or indirectly promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the business of the Company or its parent or affiliated companies.

46.     The Employment Agreement also contained a prohibition against using Plaintiffs' Electronic Communications Media for conduct unrelated to Plaintiffs' business ventures.

47.     Specifically, Section 10 of the Employment Agreement provides that "[u]se of any Electronic Communications Media on a company-provided communication system is exclusively for the conduct of business for the Company."

48.     Critically, under Section 14 of the Employment Agreement, Ray Wilson agreed that in the event of a breach, Plaintiffs could "obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction, or any other equitable remedy which may then be available."

49.     Pursuant to Section 21 of the Employment Agreement, the Employment Agreement is governed by Pennsylvania law.

### RAY WILSON ESTABLISHES A BUSINESS TO DIRECTLY COMPETE WITH PLAINTIFFS

50.     Upon information and belief and unbeknownst to Plaintiffs, Ray Wilson has been directly competing with Plaintiffs and usurping opportunities away from them for nearly sixteen years.

51.     On August 8, 2004, Ray Wilson incorporated Defendant Jamas Technology, Inc., an Alabama corporation with a principal place of business located at 64 Highway 265 Suite 501 Alabaster, AL 35007.

52.     The Registered Agent for Defendant Jamas Technology, Inc. is now Ray Wilson's son, Defendant William Blaine Wilson.

53.     Blaine Wilson holds himself out on social media as Jamas Technology's Vice President of Sales, a position he purports to have held since October 2015.

54.     The lines of business of Jamas directly compete with the lines of business of Plaintiffs within the same geographic territories.

55.     According to Jamas' publicly available marketing materials, Jamas provides (i) Contract Labor – Equipment Operators, Surface Miners, Underground Miners, Warehouse Management; (ii) Project Work – Drilling & Blasting, Belt Work, Bolting, Maintenance, Belt Drive Work, Water Control, Concrete Work, and (iii) Other Services – Dust Sampling, MSHA Training, Engineering Expertise.

56.     Plaintiffs and/or their affiliates provide essentially each and every one of these services to its coal and mineral company customers.

57.     While Plaintiffs are still investigating the depth and scope of the Defendants' deceit and unlawful conduct, Jennmar has discovered invoices, e-mails and other information directly connecting Ray Wilson to the management and control of Defendant Jamas for at least the last ten years while representing to be dedicating one hundred percent of his professional effort to working for Plaintiffs.

58.    For example, copies of Jamas Technology invoices issued to Plaintiffs' customers and prospective customers in 2011, 2012, 2013 and 2018 for "contract labor" and identifying Ray Wilson as Jamas's point of contact have been discovered in Ray Wilson's Jennmar e-mail account.

59.    Moreover, the list customers for which Defendants have been providing contract labor services and their pricing of those services aligns with those of Plaintiff Jennmar Services.

60.    This list of current, former and prospective customers of Jennmar which are also former or current customers of Jamas includes Warrior Coal, Jesse Creek Mining, Tacoa Minerals, Walter Energy and Compass Minerals.

## RAY WILSON RESIGNS AFTER PLAINTIFFS DISCOVER HIS ILLEGAL AND NEFARIOUS CONDUCT

61.    In late June 2020, Jennmar's Vice President of Sales, Rodney Poland, learned that Jennmar Services had been missing out on opportunities to place temporary workers with its long-time customer, Warrior Coal at its No. 4 and No. 7 Mines outside of Tuscaloosa, Alabama.

62.    Mr. Poland also learned that Defendant Jamas was providing the additional labor to Warrior Coal.

63.    To his surprise, he learned further that Jamas was owned and operated by Defendants Ray Wilson and Blaine Wilson.

64.    When confronted about his involvement with Jamas on July 9, 2020, Ray Wilson denied involvement with the company and contended the business belonged to his son, Blaine.

65.    On July 10, 2020, Ray resigned.

## COUNT I
## BREACH OF COMMON LAW DUTY OF LOYALTY
### (RAY WILSON)

66.    Plaintiffs incorporate Paragraphs 1 through 65 of the Complaint.

67.     In his position as Sales Manager, then as Plaintiff Jennmar's Regional Technical Sales Manager, a fiduciary relationship existed between Ray Wilson and Plaintiffs.

68.     Ray Wilson's duty of loyalty and fair dealing with Plaintiffs included duties not to act contrary to Plaintiffs' interest while employed; not to compete with Plaintiffs during his employment, and not to use Plaintiffs' resources, property, or confidential information for his own purpose, or to divert business from Plaintiffs.

69.     Wilson breached his duty of loyalty to Jennmar and betrayed its trust in him by acting contrary to Jennmar's interest while employed by Jennmar, by soliciting Jennmar's customers and prospective customers and by engaging in other acts of secret competition, and by misappropriating Plaintiffs' confidential, proprietary, and trade secret information related to Plaintiffs' customer and price lists for his own personal gain and for the competitive advantage of Jamas over Plaintiffs.

70.     As a result of Ray Wilson's willful and malicious conduct, Plaintiffs have suffered and will suffer substantial and irreparable injury to its business for which it has no adequate remedy at law, and has suffered and/or will suffer damages from Ray Wilson's breach of his duty of loyalty.

71.     The irreparable harm and damages that Plaintiffs have and will suffer are the direct result of Ray Wilson's willful breach of his duty of loyalty owed to Plaintiffs.

## COUNT II
## FRAUDULENT MISREPRESENTATION
### (RAY WILSON)

72.     Plaintiffs incorporate Paragraphs 1 through 71 of the Complaint.

73.     Under Section 7 of the Employment Agreement, Ray Wilson represented that he had "no other interest which is inconsistent or in conflict with this Agreement, or would prevent,

limit, or impair, in an way, the performance by him[] of any of the covenants or his[] duties under this Agreement." Employment Agreement, Section 7.

74.     Ray Wilson knew this representation was false when he made it and executed the Employment Agreement.

75.     At the time he made this representation he had an interest in Defendant Jamas, a direct competitor of Plaintiffs.

76.     The representation was material in that Plaintiffs would not have entered into the Employment Agreement had Plaintiffs known Ray Wilson had an interest in a competing business and would continue to promote the interests of the competing business over those of the Plaintiffs while employed or otherwise conflict with his duties and obligations to Plaintiffs.

77.     Plaintiffs reasonably relied on the representations and warranties made by Ray Wilson in Section 7 of the Agreement.

78.     Plaintiffs have suffered damages as a proximate consequence of the misrepresentation including, but not limited to, the wages, benefits, bonuses, and expense reimbursements which Plaintiffs paid to him under the Employment Agreement, as well as the lost profits from the business opportunities that Ray Wilson diverted to Jamas and away from Plaintiffs.

**COUNT III**
**FRAUDULENT SUPPRESSION**
**(RAY WILSON)**

79.     Plaintiffs incorporate Paragraphs 1 through 78 of the Complaint.

80.     A fiduciary, as well as contractual, duty existed between Ray Wilson and the Plaintiffs when he renewed the Employment Agreement in February 2015.

81.     As such, Ray Wilson was under a duty to disclose the material fact that he had an interest in a competing business and that he had been promoting the interests of the competing

business over those interests of the Plaintiffs while employed by Plaintiffs and diverting opportunities to Defendant Jamas and away from the Plaintiffs.

82.     Ray Wilson knowingly concealed and failed to disclose these facts to Plaintiffs for the purpose of inducing Jennmar to execute the Employment Agreement and/or refrain from terminating his employment.

83.     Plaintiffs have suffered damages as a proximate consequence of the misrepresentation, including but not limited to, the wages, benefits, bonuses, and expense reimbursements paid to Wilson under the Employment Agreement, as well as the lost profits from the business opportunities which Ray Wilson diverted to Jamas and away from Plaintiffs.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(ALL DEFENDANTS)**

84.     Jennmar incorporates Paragraphs 1 through 83 of the Complaint.

85.     Plaintiffs have existing business relationships with Warrior Coal, to whom they sell contract labor and other mining-related equipment and services.

86.     Plaintiffs had existing business relationships with Jesse Creek Mining, to whom they sell contract labor and other mining-related equipment and services.

87.     Plaintiffs have an existing business relationships with Compass Minerals, to whom they sell mining-related equipment and services.

88.     The Defendants knew of these existing business relationships as well as Plaintiffs' other customers and prospective customers.

89.     The Defendants intended to cause harm to Plaintiffs' business interests by diverting business opportunities with these customers away from Plaintiffs and to Defendants.

90.     No privilege or other justification exists for the Defendants' purposeful interference with Plaintiffs' business relations.

91.     As a direct and proximate result of the Defendants' tortious and intentional interference with the Plaintiffs' business relationships with Warrior Coal, Jesse Creek Mining, Compass Minerals, among other customers, Plaintiffs have suffered and will continue to suffer damages.

**COUNT V**
**CIVIL CONSPIRACY TO TORTIOUSLY INTERFERE WITH BUSINESS RELATIONS**
**(ALL DEFENDANTS)**

92.     Jennmar incorporates Paragraphs 1 through 91 of the Complaint.

93.     Acted through and with Defendant Jamas, Defendants Ray Wilson and Blaine Wilson acted with a common purpose to conspire amongst themselves to misappropriate Plaintiffs' confidential and proprietary information, to compete with Plaintiffs and to tortuously interfere with Plaintiffs' business relations.

94.     Defendants Ray Wilson and Blaine Wilson overtly acted in furtherance of their goal to tortuously interfere with Plaintiffs' business by incorporating Jamas under the laws of the State of Alabama and using the company for the improper purpose of intentionally interring with Plaintiffs' business relationships.

95.     As a direct and proximate result of Ray and Blaine's conspiracy, and establishment of Jamas, Plaintiffs have suffered and will continue to suffer damages in an amount not yet determined.

**COUNT VI**
**BREACH OF CONTRACT – CONTRACTUAL DUTY OF LOYALTY**
**(RAY WILSON)**

96.     Plaintiffs incorporates Paragraphs 1 through 95 of the Complaint.

97.     Plaintiffs have satisfied all of their obligations under the Employment Agreement.

98.     Ray Wilson's actions, as set forth herein, constitute a breach of Section 2 of the Employment Agreement.

99.     In Section 2 of the Employment Agreement (and its predecessor agreements), Ray Wilson expressly promised to "act at all times to promote the Company's business and best interests."

100.    He acknowledged that he understood that he was receiving the compensation in Section 4 of this Agreement in consideration for devoting his "entire business time and efforts to the affairs of, and for the benefit of, the Company during the term of the Agreement."

101.    Finally, he promised that "[d]uring the term of his employment under the Agreement, [he] shall not, directly or indirectly, whether for compensation or otherwise, render any services to another business, commercial or professional in nature, to any other person, corporation, firm or organization."

102.    Ray Wilson's actions, as set forth above, constitute a breach of Section 2 of the Employment Agreement.

103.    As a direct and proximate result of Ray Wilson's breach of Section 2 of the Employment Agreement, Plaintiffs have suffered and will continue to suffer damages in an amount not yet determined.

**COUNT VII**
**BREACH OF CONTRACT – CONFIDENTIALITY PROVISION**
**(RAY WILSON)**

104.    Plaintiffs Paragraphs 1 through 103 of the Complaint.

105.    Plaintiffs have satisfied all of their obligations under the Employment Agreement.

106.    Ray Wilson's actions, as set forth herein, constitute an unequivocal breach of Section 8.2 of the Employment Agreement.

107.    Under Section 8.2 of the Employment Agreement, Ray Wilson agreed not to disclose Plaintiffs' Confidential Information as described in the Employment Agreement, including, but not limited to, methods, vendors, customer lists, and pricing during his employment.

108.    Ray Wilson has disclosed Plaintiffs' Confidential Information, including, but not limited to, methods, vendors, pricing, recruitment materials, training materials and customer lists in breach of Section 8.2 of the Employment Agreement.

109.    As a direct and proximate result of Ray Wilson's breach of Section 8.2 of the Employment Agreement, Plaintiffs have suffered and will continue to suffer damages from his disclosure of Plaintiffs' confidential information in an amount not yet determined.

## COUNT VIII
## BREACH OF CONTRACT – NON-COMPETE PROVISION
### (RAY WILSON)

110.    Plaintiffs incorporate Paragraphs 1 through 109 of the Complaint.

111.    Plaintiffs have satisfied all of their obligations under the Employment Agreement.

112.    Ray Wilson's actions, as set forth herein, constitute an unequivocal breach of Section 9.1 of the Employment Agreement.

113.    Under Section 9.1 of the Employment Agreement, Ray Wilson agreed not to compete directly with his employer for any services or products provided during the term of his employment and an additional one (1) year following the termination of his employment.

114.    Ray Wilson's involvement with Defendant Jamas, as set forth herein, constitutes a breach of Section 9.1 of the Employment Agreement.

115.    As a direct and proximate result of Ray Wilson's breach of Section 9.1 of the Employment Agreement, Plaintiffs have suffered and will continue to suffer damages in an amount not yet determined.

**COUNT IX**
**BREACH OF CONTRACT – NON-SOLICITATION OF CUSTOMERS**
**PROVISION**
**(RAY WILSON)**

116.     Plaintiffs incorporate Paragraphs 1 through 115 of the Complaint.

117.     Plaintiffs have satisfied all of their obligations under the Employment Agreement.

118.     Ray Wilson's actions, as set forth herein, constitute an unequivocal breach of Section 9.3 of the Employment Agreement.

119.     Under Section 9.3 of the Employment Agreement, Ray agreed not to solicit Jennmar customers during the term of his employment or for two (2) years following the termination of his employment.

120.     Ray Wilson's actions, working through Defendant Jamas, to place temporary labor at Warrior Coal, Jesse Creek Mining and Compass Minerals facilities, for example, constitutes a breach of Section 9.3 of the Employment Agreement.

121.     As a direct and proximate result of Ray Wilson's breach of Section 9.3 of the Employment Agreement, Plaintiffs have suffered and will continue to suffer damages in an amount not yet determined.

**COUNT X**
**BREACH OF CONTRACT – ELECTRONIC COMMUNICATIONS MEDIA**
**PROVISION**
**(RAY WILSON)**

122.     Plaintiffs incorporate Paragraphs 1 through 121 of the Complaint.

123.     Plaintiffs have satisfied all of their obligations under the Employment Agreement.

124.     Ray Wilson's actions, as set forth herein, constitute a breach of Section 10 of the Employment Agreement.

125.     Under Section 10 of the Employment Agreement, Ray Wilson agreed to use the Electronic Communications Media provided to him by Plaintiffs exclusively to conduct Jennmar business.

126.     Ray Wilson used the Electronic Communications Media entrusted to him by Plaintiffs – including an electronic mail account, an IPad, and an IPhone – in violation of Section 10 in several respects, including but not limited to, viewing and transmitting pornography, running the business affairs of Defendant Jamas, and soliciting Plaintiffs' customers and prospective customers and diverting business away from Plaintiffs during the term of his employment on behalf of Defendant Jamas.

127.     These actions constitute a breach of Section 10 of the Employment Agreement.

128.     As a direct and proximate result of Ray Wilson's breach of Section 10 of the Employment Agreement, Plaintiffs have suffered and will continue to suffer damages in an amount not yet determined.

## COUNT XI
## UNJUST ENRICHMENT
### (ALL DEFENDANTS)

129.     Plaintiffs incorporate Paragraphs 1 through 128 of the Complaint.

130.     As a result of the actions, misrepresentations and concealment of the Defendants as set forth above, a significant financial benefit has been conferred on each of the Defendants by Plaintiffs' business.

131.     Each Defendant has knowingly accepted these benefits by Plaintiffs without complaint and further retained the monies resulting thereof without repaying anything of value to Plaintiffs.

132.     Plaintiffs had a reasonable expectation of compensation because Defendants diverted business away from Plaintiffs.

133.     Defendants' retention of Plaintiffs' benefits is unjust because Defendants engaged in unconscionable conduct, such as fraud and an abuse of a confidential relationship, to receive Plaintiffs' benefits.

134.     As a direct and proximate result of the Defendants' actions, Plaintiffs have suffered and will continue to suffer damages.

**COUNT XII**
**UNFAIR COMPETITION**
**(ALL DEFENDANTS)**

135.     Plaintiffs incorporate Paragraphs 1 through 134 of the Complaint.

136.     Defendants' conduct, as described above, constitute acts or practices that amount to an unfair method of competition and fall below the minimum standard of fair dealing.

137.     Defendants' conduct demonstrates a persistent effort to use the Plaintiffs' confidential and proprietary information to interfere with the Plaintiff's business, and unfairly compete with them in the marketplace.

138.     Defendants' conduct in attempting to interfere with the Plaintiffs' business and usurp business opportunities of the Plaintiffs hinders the efficient operation of the market.

139.     Defendants' conduct was intentional, willful, and outrageous, and was undertaken with indifference to the rights of the Plaintiffs.

140.     Additionally, Ray Wilson's conduct was in direct breach of the provisions in the Employment Agreement concerning his duty of loyalty, confidentiality, non-competition, and non-solicitation.

141.    As a result of Defendants' unfair competition has suffered substantial harm to the Plaintiffs for which it is entitled to collect damages, including punitive damages and payment of the Plaintiffs' attorneys fees, in an amount not yet determined.

WHEREFORE, Jennmar requests that this Court:

(a)    Issue a preliminary injunction and permanent injunction that enjoins Ray Wilson from disseminating or otherwise accessing or using Plaintiffs' trade secrets, confidential and/or proprietary information that he unlawfully obtained from Plaintiffs;

(b)    Order Defendants to identify any individual and/or entity to whom he disclosed and/or disseminated Plaintiffs' confidential and/or proprietary information;

(c)    Order that Defendants be directed to immediately return to Plaintiff all such documents and information;

(d)    Order Defendants to account to Plaintiffs for all gains, profits, and other advantages unjustly obtained by Defendants as a result of Defendants' wrongful acts;

(e)    Order a disgorgement of all revenue of Jamas, or any other competing entity, realized as a result of Ray Wilson, Blaine Wilson, or Jamas Technology, Inc.'s direct competition with Plaintiffs and solicitation of Plaintiffs' clients, including, but not limited to, compensatory damages;

(f)    Order a forfeiture of all compensation, business expense reimbursements and the value of all other benefits Ray Wilson received from Plaintiffs from the date he first breached his duty of loyalty.

(g)    Award Plaintiffs compensation for any and all damages Plaintiffs have suffered as a result of Ray Wilson's disclosure of confidential information and misappropriation of trade secrets under federal and state law, breach of contract, and breach of duty of loyalty, including, but not limited to, compensatory damages, exemplary, punitive damages, attorneys' fees and costs incurred in prosecuting this action, pre-judgment interest, post-judgment interest; and

(h)    Award Plaintiffs all other and further relief to which it is entitled at law or in equity.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated: July 30, 2020                              Respectfully submitted,

/s/ Jack W. Selden
BRADLEY ARANT BOULT CUMMINGS LLP

Jack W. Selden
Ala. I.D. No. 8444-D56J
Jude S. Halawi
NY I.D. No. 5519624
(Pro Hac Vice to be filed)
1819 5th Avenue North
Birmingham, AL 35203
(205) 521-8000

REED SMITH LLP

Brad A. Funari
Pa. I.D. No. 89575
(Pro Hac Vice to be filed)
Alex G. Mahfood
Pa. I.D. No. 324047
(Pro Hac Vice to be filed)
Matthew A. Caplan
Pa. I.D. No. 327876
(Pro Hac Vice to be filed)
225 Fifth Avenue

Pittsburgh, PA 15222
(412) 288-3131

*Counsel for Plaintiffs Jennmar of
Kentucky, Inc. and Compliance Staffing
Agency d/b/a Jennmar Services*